LEDWARDS, Judge.
Claimant/appellant James D. Brown filed a claim for worker’s compensation, averring that as a result of his exposure to the toxic chemical sodium hydroxide he suffered acute injuries to his upper respiratory system and severe neurotoxicity and was disabled. Penalties and attorney fees for arbitrary and capricious refusal to pay compensation and medical benefits were also requested. His employer, Southeast Louisiana Contractors, disputed the claim. Following a trial, the court found the claim was without merit and dismissed the case. We affirm, finding that Mr. Brown failed to prove that he sustained a compensable injury.
Mr. Brovm was a 51 year old pipefitter employed at Southeast Louisiana Contractors. According to his testimony, on the date in question Mr. Brown was working along with 12 other men in a “fab tent”, a metal construction on a concrete slab into which water was draining. His supervisor was Jerry Pitch. On |3that morning, the wind was blowing forcefully and he had been smelling ammonia since about 9:00 a.m., but paid no attention because he was busy. Brown had been told by his foreman that there was nothing to worry about. At around 11:00 a.m., he was cutting a fitting and when he stood up, he felt dizzy and put the fitting on a tripod. He ran outside and vomited. The employees were moved about a quarter of a mile away and stayed there for about an hour and a half. Mr. Brown reported the illness to his foreman and safety man. On the way to the safety trailer, there were 12 or 13 men ahead of him and someone was telling them that the lids had been left off a mixing vessel and that some of the gas had escaped in a contained area. Mr. Brown was sweating and had a bad headache. When he arrived at the safety trailer, he was given oxygen and something for his upset stomach. He noticed that he couldn’t smell his clothes. Feeling better, he went back to work. He started throwing up again and got a cold chill.
The next morning his lungs were burning. At work, at the safety trailer, he asked for and was given a material data safety sheet (MSDS) for sodium hydroxide. Mr. Brown did not remember exactly what his employer told him about the chemical to which he was exposed. He asked to be examined by a doctor and was sent to Dr. Henning. He complained that his lungs burned, that he had headaches and that he was vomiting. He was given a chest inhalant for poisonous gas, and medication for his stomach and headaches. Mr. Brown attempted to return to work but got sick. He was cleared for light duty work, but none was offered to him. He was later suspended from work. He was treated by Dr. Joyner. In addition to the headaches, nausea and loss of smell, Mr. Brown also testified that his hands and *793 feet go numb and that he has lost 30% of his 14vision in his right eye. All he can do now is light work around the house.
Jerry Hamilton, safety technician at Southeast, testified that a contractor on the premises was using sulfuric acid to neutralize a caustic solution of sodium hydroxide, releasing the compound hydrogen sulfide. The odor came from that area. The waste container is located about 120-150 yards north of the fab tent. The wind was out of the north that day. The tank is about 40 feet long and 10 feet tall. Immediately following reports of the problem, at about 11:00 a.m., Mr. Hamilton was called to the site. Employees working in the fab tent had been pulled out as a precaution but not evacuated. He made some measurement tests with a “multigas” monitor. Sodium hydroxide is either a liquid or a solid, and cannot exist as a vapor in the atmosphere, so it could not have been leaking from the tank. The permissible exposure limit for hydrogen sulfide is 10 parts per million for an 8 hour period, and can be smelled at very low levels. Measurements made on top of the tank fluctuated between 6 and 7 marks a minute. At about one-fourth of the way from the tank in direction of the fab tent, no detectable levels of the chemical were found. At the tent itself, although the sulfide could be smelled, there were no detectable levels. The crews were called back to work.
On cross examination Mr. Hamilton stated that liquid sodium hydroxide is a corrosive irritant to the skin and mucous membranes, and can cause damage to lung tissue. It can also react with other substances. Mr. Hamilton did remember seeing Mr. Brown at the safety trailer at some point during that day, but did not recall seeing him throw up. Mr. Hamilton stated that the multigas monitor cannot detect sodium hydroxide.
Mr. Michael Sharp, an industrial hygienist, was involved in a review of the | ¡^incident. He testified that the readings of the emissions were below the OSHA allowances for hydrogen sulfide. He did not speak with anyone about Mr. Brown’s problems, but some of the symptoms which Mr. Brown experienced are consistent with exposure to sufficient concentrations of hydrogen sulfide. That substance, if present, is at a stronger concentration at ground level where Mr. Brown was working than at higher levels. A cutter such as that used by Mr. Brown would ignite hydrogen sulfide in sufficient concentration.
Walter Harndin, a paramedic, was at the safety trailer on the day of the incident when 17-20 people, including Mr. Brown, came in complaining of headaches and having smelled the odor. He did not see anyone, including Mr. Brown, vomit, although Mr. Brown did have a complaint of nausea. One man went home. Everybody else went back to work, including Mr. Brown. None of the others have had compensation claims based on the incident. He did not distribute the MSDS sheets to any of the employees. There were light duty office jobs available assisting him and Mr. Brown was supposed to come in one day, but didn’t show up.
Charles Evans, (for unknown reasons referred to in the transcript variously as “Mr. Adams”) was also a paramedic at Southeast. He testified that he prepared the accident report in the present case. Mr. Brown was placed on light duty and the doctor stated he could return, but he did not come back to work. Company records showed that Mr. Brown worked 11/6 hours on the day of the injury as well as on the following day. On May 13th he worked a half hour, and did not come in on the 14 th -16 th. Mr. Evans attempted to call Mr. Brown to find out why he did not return to work. Mr. Brown was suspended because of job abandonment.
| fiMedical reports of Dr. Andrew Hen-ning and Dr. Lee Roy Joyner were admitted into evidence. Dr. Henning was the physician initially consulted by Mr. Brown. On the day following the incident, Dr. Henning examined Mr. Brown and took an x-ray which was negative. An *794 inhaler and phenergan were prescribed. On May 15, Mr. Brown again consulted Dr. Henning with complaints of nausea, coughing and dizziness. Dr. Brown’s diagnosis was of bronchitis due to gas exposure, and sinusitis. Medication for nausea and an antibiotic were prescribed. Mr. Brown was released for light duty office work. He returned on May 19 and a repeat chest x-ray and blood work was ordered. A patient note dated May 21 indicated that Dr. Henning advised Mr. Brown “it will take time for poison to work its way out of his system. Continue to go to work and keep [next appointment].” The x-ray and blood work came back normal. On May 27, Dr. Henning again indicated that Mr. Brown could do light work, and noted his diagnosis was “chemical bronchitis”. The notes do not indicate that Dr. Henning referred Mr. Brown to a pulmonologist.
Mr. Brown consulted Dr. Joyner in Bo-gulusa. Dr. Joyner noted that Mr. Brown had developed a severe and rapidly progressive neurotoxicity as well as upper and lower respiratory irritant injury. He had conjunctivitis, and “a substantial abnormal neurological exam particular as it relates to balance and coordination.” Dr. Joyner found that Mr. Brown’s physical symptoms corroborated his story and that he suffered from a marked disequilibrium consistent with hydrogen sulfide neurotoxicity that is severe and progressive. Mr. Brown had developed a persistent cough, and has increased chest tightness, cough, and wheezing. He also developed profound weakness and fatigue along with severe abdominal pain. He is short of breath with any activity. He |7developed “a myriad of neurological symptoms” including severe continuous headaches, confusion, and change in short term memory faculties. He is developing insomnia and a marked change of temperament.
Dr. Joyner also found “substantial membrane irritant chemical exposure with substantial residual conjunctivitis, rhinitis and bronchitis. Pulmonary functions, in spite of this fact, at rest are normal.” The report concluded:
“It is my strong opinion that Mr. James Brown should have been more completely evaluated initially. His symptoms have been profound from the outset. The irritant symptoms are, fortunately, resolving subjectively. His neurological symptoms are rapidly deteriorating and are disturbing. This patient, at this point in time, is totally disabled and needs urgent care with neurology consultation, ophthalmologic consultation, and consultation ... regarding the need for urgent hyperbaric oxygen treatment to prevent further neurotoxic damage and irreversible brain injury and dysfunction.”
A bronchoscopy taken on June 5 indicated resolving bronchitis. A brain test performed on June 10 revealed a focal defect in the frontal lobe and stated that the pattern was non-specific, noting that “the possibility of clinical depression should be considered ... toxic exposure cannot be excluded.” Laboratory tests showed minimal chronic lung inflammation.
Mr. Brown did not see Dr. Joyner following this consultation.
Following trial, the court took the matter under advisement and subsequently rendered judgment. In the judgment the court stated that it listened attentively to the testimony of the witnesses and observed their demeanor. In considering the entire record as well as the credibility of the witnesses, the court found the claim was without merit and dismissed the case.
On appeal, Mr. Brown avers that the court erred in dismissing the case because he proved by competent uncontradicted evidence that he had and accident | swhich rendered him disabled from his normal job duties.
The Louisiana Worker’s Compensation Law provides coverage to any employee who suffers “personal injury by accident arising out of and in the course of *795 his employment.”[1] A worker’s compensation claimant has the burden of establishing by a preponderance of the evidence that an accident occurred on the job and that he sustained injury. The claimant’s testimony alone may be sufficient to discharge this burden of proof, if no other evidence discredits or casts serious doubt on the claimant’s version of the incident and if the claimant’s testimony is corroborated by circumstances following the incident.[2] In determining whether the claimant has discharged his burden of proof, the hearing officer should accept as true a witness’s uncontradicted testimony, even though the witness is a party, absent “circumstances casting suspicion on the reliability of this testimony.”[3] A hearing officer’s determinations as to whether a claimant’s testimony is credible and whether he has discharged his burden of proof are factual determinations not to be disturbed on review unless clearly wrong or absent a showing of manifest error.[4]
To the extent that the trial court evaluated the credibility of Mr. Brown, other evidence in the record casts doubt on the reliability of his testimony. Southeast does not dispute that a noxious odor was emitted on the date in question and that a number of employees were sickened immediately. Measurements |8taken within a few minutes after the incident was reported revealed no detectable levels of hydrogen sulfide near the vicinity of the fab tent where Mr. Brown was located, and that any levels in other vicinities were well below the OSHA safety limits. The evidence also shows that sodium hydroxide does not exist in gaseous form and therefore could not have been inhaled by Mr. Brown. There was no evidence of any other substances which Mr. Brown could have inhaled and which could have caused his symptoms. Mr. Brown did not offer the testimony of any co-workers who were present that day to corroborate the extent of his illness. There were no other recorded complaints of illness except headaches for any other employees.
Relative to his own problems, the medical evidence indicates that at the most, Mr. Brown suffered temporarily from bronchitis, possibly as a result of his exposure to the odor. He was treated by Dr. Henning but was released to light duty work within 3 days. The medical tests conducted by Dr. Henning are consistent with that diagnosis. We note that no tests taken by either Dr. Henning or Dr. Joyner indicate that the cause of Mr. Brown’s symptoms were poisonous gas exposure. The objective tests performed by Dr. Joyner do not support the diagnoses made in that physician’s report, who based his conclusions largely on Mr. Brown’s subjective history. Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible.[5]
The record shows that Mr. Brown did not avail himself of the office job, which both Mr. Harndin and Mr. Evans testified were made available to him. After he failed to report to light duty work, Mr. Evans attempted to contact Mr. linBrown without success.
The hearing officer determined that Mr. Brown failed to prove, by a preponderance of the evidence, that he sustained a com-pensable injury within the meaning of the *796 worker’s compensation act. After a careful review of the record, we find no manifest error in that conclusion. The judgment of the trial court is affirmed.
AFFIRMED.

. LSA-R.S. 23:1031; Sparks v. Tulane Medical Center Hospital and Clinic, 546 So.2d 138, 139 (La.1989); Benoit v. Maco Manufacturing, 93-0396 (La.App. 1st Cir. 3/11/94), 633 So.2d 1301, 1307.

. Bruno v. Harbert International, Inc., 593 So.2d 357, 361 (La.1992); Smith v. Grand Isle Shipyard, 95 0259 (La.App. 1st Cir. 10/6/95), 671 So.2d 415, writ denied 95-2709 (La. 1/26/96); 667 So.2d 524.

. Bruno v. Harbert International, Inc., 593 So.2d at 361; Smith v. Grand Isle Shipyard, 671 So.2d at 416.

. Bruno v. Harbert International, Inc., 593 So.2d at 361.

. Sistler v. Liberty Mut. Ins. Co. 558 So.2d 1106, (La.1990).